1817.

Salmon and another *against* Rance and another.    *Sunbury.*

In Error.     *Monday, June 16.*

ERROR to the Common Pleas of *Columbia* county, in ejectment for 150 acres of land.

The case was argued by *Hall* and *Watts*, for the plaintiff in error, and *Bradford* and *Huston*, for the defendant, and is fully stated in the opinion delivered by the Chief Justice.

Tilghman C. J. This is an ejectment brought by *John* and *George Rance*, against *Joseph* and *John Salmon*, for 150 acres of land, part of a tract containing upwards of 400 acres surveyed for *Thomas Christie* in *October*, 1785. The record exhibits a large mass of parol evidence, on which the Court below delivered a charge which is complained of by the *Salmons*, plaintiffs in error. The case which the plaintiffs below endeavoured to make out, was in substance as follows: For some time previous to the year 1800, the plaintiffs had been in possession of *part* of the above-mentioned tract, claiming under an improvement made by a certain *Melchior Heflick*. But, although in possession, they were apprehensive that their title was not good, the land having been appropriated by another person under a warrant and survey, before the commencement of the improvement. In the year 1800, the plaintiffs were informed by *Joseph Salmon*, that an opportunity would soon be offered, of securing a good title to the whole tract of land; that the title was in *Robert Morris*, against whom *Richard Salmon*, (cousin of *Joseph*,) had

*Marginal syllabus:* A, agreed with B, who had a judgment against C, to purchase land at a sheriff's sale on that judgment for 424l. being told by D, that C had a good title. A, paid B, 95l. and bid at sheriff's sale 185l. but never paid any thing more, and got no sheriff's deed, and claimed under an improvement. D, afterwards purchased the land of another person who had the title. *Held*, that the title of D, would not enure to the use of A, without A's paying the balance of principal and interest to B, though D, encouraged A, to buy at sheriff's sale, and asserted, that C, had a good title, and received part of the money paid to B, and was interested in the transaction.

Nor can A, in such case, claim part of the land, and reject the rest. If he disaffirms the contract, he is only entitled to a reimbursement of his money and interest.

A court of error will not minutely inquire into the time and order in which a witness is examined in the Court below · Evidence properly of a rebutting nature may be given in anticipation, if the Court permit it.

One who is security in the recognisance on appeal may be discharged by the Court, and other security taken in his stead, in order to make him a witness.

One who has sold part of the land in dispute for a bond, which he has parted with without warranty, is a good witness for the plaintiff. Nor is it any objection to him, that he gave the vendee a covenant of warranty in case the plaintiff should recover; for he swears against his own interest.

A memorandum made by a deputy surveyor to a survey, of a matter not within his official duty to state, and which may be proved by better evidence, is not evidence; especially where the deputy surveyor himself was examined on oath in the cause.

obtained a judgment for upwards of 1500 dollars, on which a *testatum fieri facias* had been issued, and levied on the said tract, which was shortly to be sold by virtue of a writ of *venditioni exponas ;* that if the plaintiffs would pay 27 dollars an acre, the whole tract should be secured to them by a deed from the sheriff of *Northumberland* county, which would give them a good title. The defendants agreed to give 27 dollars an acre, and paid to *Richard Salmon*, 95l. 7s. 6d. in property of various kinds, including two notes, one for 9l. and the other 11l.; and besides this, *Andrew Rance*, father of the defendants, gave two bonds of his own, for 75l. each. The land was put up to sale by sheriff *Irwin*, and struck off to *John Rance*, for 185l. No part of this 185l. was ever paid, neither did the sheriff execute a deed of conveyance, or make return of the writ of *venditioni exponas*. No evidence was given of the payment of *Andrew Rance*'s bonds. The plaintiffs contended, that some part of the money paid by them, went into the hands of *Joseph Salmon ;* and that in fact, *Richard* and *Joseph Salmon*, well knowing, that *Robert Morris* had no title, had combined and confederated in a plan to defraud them, after which *Joseph* purchased the true title from *Philip Schrœder*, and obtained the possession. This, I say, is the substance of the case, which the plaintiffs contended, they had made out by their evidence. On the other hand, the defendants denied, that there was any intent to defraud or deceive ; and asserted, that *Richard* and *Joseph Salmon*, really thought, that *Robert Morris*'s title was good ; that *Joseph* was no way concerned in point of interest, nor ever received, for his own use, any part of the money paid by the plaintiffs ; that the two bonds of *Andrew Rance* were not paid ; and that the plaintiffs, instead of going on to pay 27 dollars an acre, for the whole tract, had paid no more than 95l. 7s. 6d. as before stated, after which they stood upon their improvement title, and declined taking a title from the sheriff, under the execution against *Morris*. Whether the plaintiffs or defendants were right in their conclusions drawn from the evidence, it is not for us to say, nor do I intimate any opinion on that subject. The question is, whether the Court below were right in their charge to the jury, which is now to be considered. The charge was, that if the jury should be of opinion, that *Joseph Salmon* encouraged the plaintiffs to purchase at the sheriff's sale, and asserted, that *Morris* had

a good title, and especially, if *Joseph Salmon* was interested in the transaction, and received part of the money paid by the plaintiffs, in such case, the title obtained by *Joseph Salmon*, from *Schrœder*, would enure to the use of the plaintiffs, and the verdict ought to be in their favour. It appears to me, that this charge was more favourable to the plaintiffs than the law will warrant. The *legal title* was in the defendants, from whom the plaintiffs demanded *equity*. What then was the equity of the case? The plaintiffs had engaged to pay 20 shillings an acre to *Richard Salmon*, which would have amounted to about 424*l.* for the whole tract; of this, there was no evidence, that more than 95*l.* 7*s.* 6*d.* was paid, nor had they made any offer of the residue. There could be no equity, in forcing the legal title from the defendants, without paying the balance of principal and interest. But, say the plaintiffs, we ask no more than 150 acres. The answer is, that the engagement was, according to the plaintiffs own pretentions, *to take the whole, and pay for the whole;* and unless the whole is paid, *Richard Salmon* loses the greatest part of *Robert Morris*'s debt. But why is it that the plaintiffs only demand 150 acres? The answer to this question, leads to an important consideration, which ought to have been submitted to the jury. The defendants say, that on this tract of land, were *several persons settled,* claiming under *improvement rights;* that these persons were suffered to remain unmolested by the plaintiffs; and that in truth, the plaintiffs chose rather to *share the land with these settlers,* than go on to complete the purchase from sheriff *Irwin.* The jury ought to have been told, that if the plaintiffs declined to carry into effect the *whole agreement* made with *Richard Salmon,* this would amount to *a disaffirmance of the contract,* in which case, the most that they could be entitled to, would be a reimbursement of what they had paid, with interest; but they would not be entitled to recover the land from *Joseph Salmon.* But, whatever might be the opinion of the jury on that point, the plaintiffs have not done enough to entitle them to a recovery in this ejectment; because they have not paid, or tendered, what, according to their own story, they had agreed to pay. I am, therefore, of opinion, that there was error in the charge of the Court. But, besides the exception to the charge, there were five bills of exceptions taken by the defendants on matters of evi-

VOL. III.—R r

dence. 1. The first exception was to a private memorandum book, or docket of sheriff *Irwin*, in which was an entry, that this tract of land, containing 424 acres, was *struck off* to Mr. *Rance*, for 185*l.* This book was admitted in evidence, and in my opinion, improperly. If the land was sold by the sheriff, the best evidence would be, his return to the *venditioni exponas.* · But even, if it were material to the plaintiffs' case, to shew, that the land was *struck off* to *Rance*, the proper evidence would have been, the oath of some person present at the sale. There could be no difficulty in procuring evidence of what passed at a *public sale.* The general rule is, that evidence shall be *on oath.* These entries in the sheriff's book, were *not on oath;·* no body was responsible for the truth of them. The law knows nothing of the sheriff's private entries, and pays no regard to them. The book, therefore, ought not to have been received as evidence.

2. The evidence of *Peter White*, when he was called a second time, by the plaintiffs, was objected to ; not because the witness was incompetent, or the matter irrelevant, but because, the defendant supposes, the testimony given by him *then*, was out of place, and ought to have been reserved as rebutting evidence. Perhaps it might have been very properly *reserved ;* but this is not a point on which a judgment should be reversed. The plaintiff may, if he pleases, with the Court's permission, anticipate the defendants' case, and defeat it. The Court, in their discretion, will regulate the order in which the evidence shall be given. But, for a *Court of error*, to enter minutely into matters of that kind, would be, to intrench, unnecessarily, on the right of the Court below, and to *embarrass* the administration of justice, instead of *assisting* it. I think there is nothing in this exception.

3. The third exception is to the admission of *Frederick Rance*, as a witness. He was alleged by the defendant to be incompetent, because he had been security for the plaintiffs, on their appeal from the report of the arbitrators in this cause. To remove this objection, the Court discharged him from his recognisance, and took other security in his stead. I do not see why the Court of Common Pleas might not do this. It is a common practice to strike out bail and take new bail, for the purpose of making a witness. This is not exactly the striking out of bail, but it falls within the reason of *it.* The security, in the first instance, was taken by the Court's

own officer, (the prothonotary,) and the new security being taken *under their own inspection*, no harm can be done to the defendant, for whose use the security was given. I am, therefore, of opinion, that *F. Rance* was a good witness.

4. The fourth exception was to the admission of *John Keller*, as a witness, on the ground of *incompetency*. *Keller* had sold and conveyed to *William Marr*, his title, under an improvement right, to *part of this land*, for which *Marr* had given him his bond for 85*l.* As to the land, *Keller* had parted with it, without warranty, so that it was out of the question. But he had also given to *Marr*, a covenant of warranty of the land, in case *Rance* should recover it. This could be no objection to his evidence, because, in swearing to establish *Rance*'s title, he swore against his own interest. He was, therefore, a competent witness.

5. The fifth and last exception was to the rejection of a memorandum, in writing, made by *Thomas Woodside* (deputy surveyor,) at the foot of a return of the survey of the tract of land in question, made by the said *Woodside*, in the year 1812. The memorandum is as follows. " *N. B.* The " survey above stated, was regularly surveyed to *Thomas* " *Christie*, but, by mistake, the return appears to have been "made, on the ground on which *Preserved Cooley* was sur- " veyed ; the original drafts have *Thomas Christie* marked " on the survey above stated."

The deputy surveyor is a sworn officer, and *his return* to an order of survey is evidence, because the law supposes, that an officer has done his duty. But when he goes beyond the line of his duty, his work is not evidence, especially when he undertakes to say, what may be proved by better evidence. Now here, besides making the return of survey, he tells of *a mistake made many years before, by another person;* a fact, of which he could have no certain knowledge ; he speaks also, of an *indorsement on an official paper*, which must appear on the paper itself, and therefore, nothing but the paper itself would be evidence. In fact, Mr. *Woodside* himself was examined as a witness in the cause, and his testimony *on oath* as to the matter of this *nota bene*, was better evidence than the *nota bene itself*, which was *without oath*. It appears to me, therefore, that the Court did right in rejecting this evidence.

Upon the whole, I am of opinion that the judgment should be reversed, and a *venire facias de novo* awarded.

GIBSON J. Upon the facts, it is very clear, the plaintiffs could not recover on their improvement right; for when *Heflick* began his settlement, the land was not vacant, and the Court before whom the cause was tried, did right to instruct the jury to that effect. Neither could they claim under *Morris*, for his title, if he had any, (which does not appear) was not conveyed to them. It, therefore, became necessary for them to rest their cause upon their purchase from *Richard Salmon*, and to shew, that they were induced to take a defective title by the fraudulent misrepresentations of *Joseph Salmon*. I have no hesitation in saying, that a person confederating with a vendor, and by fraudulent misrepresentations, inducing a vendee to purchase a defective title, and to pay a valuable consideration for it, will, in equity, be considered as standing exactly in the same situation as the vendor himself, as regards a title acquired by him afterwards. If a person, having a right to an estate, permit or encourage a purchaser to buy, the purchaser shall hold. *Sugden,* 480. In point of principle, I can see no difference between an existing right, and one acquired afterwards. In *Montifiori* v. *Montifiori*, 1 *W. Bl. Rep.* 363, it is laid down, that as against the party guilty of the fraudulent misrepresentation, the thing *shall* be as *represented* to be. If, then, by the fraud of *Joseph Salmon*, the plaintiffs had been induced to purchase and pay for *Morris*'s title, as being good against all the world, the former would be estopped from setting up his after acquired title, or averring to be the contrary of what he represented as the fact. He would stand precisely in the situation of *Richard Salmon*, who, in case he had acquired the title under *Christie*'s warrant and survey, would have been a trustee for the plaintiffs, whom a chancellor would compel to convey. I take every misrepresentation to be fraudulent, where the party making it, positively asserts a fact to be true, which he does not know to be so, and which turns out to be untrue. To a party having a right to information, and who suffers damage from reposing confidence in such assertion, it amounts to a warranty of the truth of the fact. But it would be different if a person should merely state his belief, and disclose the reasons on which he founded it. The party receiving the information would then judge for himself. Now, it appears from the evidence, that the purchase from *Richard*

*Salmon*, was brought about, by the instrumentality of *Joseph Salmon*. He brought the parties together, averred that *Morris* had a good title, that it had been exhibited to him, and proposed the terms of the purchase, and the mode of vesting the title. If, then, the plaintiffs had complied with their part of the contract, there can be no question, but they would be entitled to recover. But in this particular, their case is totally deficient, and in this point of view, the Court below erred, in not leaving it to the jury. The purchase money, at the rate of twenty shillings the acre, amounted to 424*l.* Of this sum, not more than 95*l.* 7*s.* 6*d.* was actually paid. Two bonds of 75*l.* each, were given by the father of the plaintiffs; but it does not appear, that their contents and the balance of the purchase money was ever paid, or tendered; which I hold indispensable to the plaintiffs recovery. But it is contended, that having paid a part of the consideration, they can recover *pro tanto.* To this I cannot assent. They can only recover by affirming the purchase from *Richard Salmon*, which is the foundation of their title. It is this contract that would, under certain circumstances, draw after it the equitable interest in the title, afterwards acquired by *Joseph Salmon.* It cannot be affirmed in part, and disaffirmed in part. It would be a most unreasonable advantage to permit them to complete their agreement up to a certain point, there stop, and recover in proportion. That would be to make a new contract between the parties, totally different from the original agreement.

2. The admission of the memorandum of the sale to the plaintiffs, found on the docket of sheriff *Irwin*, was indisputably an error. The *venditioni exponas*, by virtue of which this sale was made, having never been returned, the sale, if evidence at all, was a matter *in pais*, to be proved like any other fact. I cannot conceive on what ground this private memorandum could be supposed evidence. The fact was susceptible of higher proof from the testimony of by-standers; and I apprehend that even a book of original entries would not be evidence to prove the sale of even personal property, against a third person, for the vendor might be called.

3. *Keller*, who was objected to as interested, was not so in point of fact. It is true, that in his deed to *Marr*, there was an agreement that he should have a further sum in case

the plaintiffs succeed in establishing their title. This interest, such as it is, was parted with before he was offered as a witness, and, at all events, it does not appear the plaintiffs were privy to the engagements between him and *Marr*, without which they could not be divested of the interest they had in his testimony. But, in truth, his interest is, that the plaintiffs should not recover; for he then would have been relieved from his engagment to warrant the title he conveyed to *Marr*. He was, therefore, properly admitted.

4. I also think *Frederick Rance* was properly admitted. The power of the Court to substitute bail, for the purpose of making a witness competent, is undoubted. It is a discretionary power, in the exercise of which, care will, however, be taken, that no prejudice happen to the party secured. The person offered as a substitute, ought to be clearly and indisputably unexceptionable in every view. With this restriction, it should be liberally exercised, for the attainment of truth, between the parties. In the present case, there are no peculiar circumstances to distinguish it from any other.

5. It is objected, that the certificate attached to the return of survey on *Christie*'s warrant, made by *Thomas Woodside*, should have been received as evidence. This certificate sets forth no fact, occurring in, or connected with, the execution of the official duty of the surveyor; but a mere inference of a fact, from documents remaining in his office. These documents, then, ought to have been produced, being the best evidence of which the case was susceptible. The certificate was secondary, and properly rejected.

DUNCAN J. gave no opinion, having been counsel in the cause.

Judgment reversed, and a *venire facias de novo* awarded.